failing to recognize that the behavior of the BPA and the WAPA in overcharging on the amounts that they charge for electricity in the PX and ISO markets was a clear breach of their contract. But I'm puzzled by this, because it seems to me that if there is any agreement here between the power suppliers and the power purchasers, it's an agreement to arbitrate. And so why aren't the parties bound under that view to arbitrate this dispute? It seems to me that one of the parties has to have asserted that it should be arbitrated. And as far as I know, the government never asked to have the case submitted to arbitration like any other provision, free to waive arbitration. And the government's position is there's been no breach, and therefore, no problem. They didn't seem to contest it. Your clients could have asserted, initiated arbitration, too, under the clause, right? That would have been available to us, to be sure. But I mean, there is an arbitration clause in the provision. But obviously, at this point in the litigation, both sides have essentially waived that provision. So it's properly before the—it was properly before— Well, there hasn't been any formal waiver of it, right? Well, I think—well, as far as I know, I don't think there's been a formal waiver of it. On the other hand, case law is pretty substantial. It says that if the parties operate and litigate a matter before the court for an extended period of time, they have, in effect, waived the arbitration provision in the contract. So I don't think there's an issue there.  Well, I don't know that you—I don't know under what circumstances you could say the only agreement is an agreement to arbitrate. I mean, there is clearly an arbitration provision in here, and the government could have foisted that or could have asserted that if they'd chosen to do so. They didn't. They're perfectly comfortable litigating this matter in the court of federal claims. We were perfectly comfortable litigating it there. And, candidly, the way the cases played out, at least under our interpretation, obviously, the power suppliers agreed to be bound by the tariff agreement. The tariff agreement says that they will only pay a single rate, that that's a rate that's subject to determination by the Federal Energy Regulatory Commission. The commission has, in fact, evaluated that rate independently in another proceeding, concluded that the actual rates charts on an individualized basis were excessive. There was a reset process that was then implemented pursuant to the tariff in which additional settlement statements were presented to the BPA and the WAPA. Under the agreement, they agreed to all payments pursuant to the tariff under those circumstances. And, indeed, the specific language is, if for any reason a PX creditor receives more than the amount to which it is entitled under the PX tariff, it shall forthwith pay the excess amount. I don't know how you can have a contract that's any plainer than that. They know they have an excess amount. They have an obligation to pay. They have never paid that money. And, as a consequence of that, that's pretty much straightforward breach of contract, at least where I come from. Now, the court of federal claims and the government make a couple, three arguments to try to get around it. It seems to me that's the core of what this case is about. And you can assert privity, but the reality is that who else could this obligation run between as opposed to the buyers and the sellers? We know from these agreements that the PX and the ISO are merely acting as agents for all of these parties. They don't have the resources to buy and sell electricity. Nobody would enter into agreements for this kind of arrangement, what the court said in the supervisory goodwill litigation, that it would be madness to go down. The restatement of agency. I'm sorry? The restatement of agency. Yes, Your Honor. Explains that the party's characterization of their relationship is not controlling. That's restatement third, section 102. And, instead, we look to whether the alleged agent agreed to be controlled by the principal, which is section 101. Does the record contain any evidence that either Cal ISO or Cal PX agreed to be controlled by the government? Yes, because I would go to the manual, which is incorporated into the tariff expressly at A449 and SA8, and section 1.4 says the manual is incorporated. And the manual explicitly says that the PX and the ISO in consecutive provision says, acts as an agent for all of the PX participants. So, yeah, I don't think there's any question about that. This isn't a matter of us characterizing it this way. This is a matter of the agreement by its terms saying that the PX and the ISO will act as agents for all of the participants. And it only makes sense in this context, Your Honor. You're not answering my question. I'm sorry. What in the record shows that the alleged agent agreed to be controlled by the principal, that is, by the government? Well, it seems to me that the agent, the PX and ISO, were part of the original creators of the manual itself. So the manual under which the PX and ISO operate, which is incorporated into the tariff as part of the agreement, reflects the ISO and PX's willingness to undertake on behalf of all of the participants in this matter. Indeed, if you were looking for anything, it would seem to me, Judge Wallach, you'd have to be looking for language that would have carved out the agency relationship between these entities and BPA and WAPA, because it's absolutely clear that across the board for every other party in this exchange. Is there any evidence on the record that demonstrates the government intended to confer a benefit on appellants only and not on other market participants? No. I think the record reflects that BPA meant to enter into an agreement with all of the market participants, potentially. You're familiar with the holding in glass? I'm not familiar with the holding in glass. We've held that a party must demonstrate that the contract in question, quote, expresses the intent of the promisor to benefit the party personally, independently of his or her status as part of a class of similarly situated parties. Well, I don't know the facts of the case well enough to be able to explain exactly how it might play out, but it does seem to me, Your Honor, that when you're talking about a situation of an exchange, which is what this is, that the law in regulating exchanges says quite clearly that by simply entering in, you agree to abide by the terms of the exchange as the rules that interact, that govern how the parties to the exchange interact. Yeah, and interestingly enough, the two cases on which you rely on are incorporating arbitration clauses. That's what they're doing. Right, that's true. Well, you can't be contending that there are individual agreements with respect to buyers and sellers here, because we're talking about a fungible good under Eurodif. Seems to me pretty clear that there can't be individual contracts, right? Right, and it would be unrealistic to think you could have this kind of a scheme and have individual contracts, and it's unrealistic given the nature of the business. So your theory is there's a collective contract between all the buyers and all the sellers? Yes, and that's exactly what I think the exchange cases stand for, that when you're going to set up an arrangement like this, in which you have the exchanges which operate as agents on behalf of both sides, and then operate with fiduciary responsibilities to both sides, that the contractual relationships, the contractual obligations flow from the real parties of interest. Well, but your cases don't involve that, that the exchange cases that you cite are cases of individual contracts between two parties. And the question was whether the arbitration clause got incorporated into those contracts as a result of the exchange agreement. But Judge Dyke, it seems to me the parallel here is there is clearly an agreement between the PX and the federal instrumentalities, right? And that agreement incorporates the tariff and the manual, and imposes all of those obligations directly on the instrumentalities. And it does it either for the benefit of, or through an agency, or frankly, I would say through an exchange arrangement where the law, which is simply recognized, that the obligations that flow from one party to the other party only make sense in this context. I'm having difficulty seeing that there was an agreement imposing any obligations outside of the arbitrable context. What the agreement itself says in the covenant, on the participation agreement, it says it will perform all obligations under the tariff involving billing and collection. And then specifically, as I read earlier, it says the PX creditor, if he receives more than the amount that he's entitled to, he will pay back. That's an agreement directly under the tariff. And that's the agreement that they incorporated expressly when they entered into the arrangement with the PX and the ISO in the first instance. So it seems to me, you know, admittedly, they brought it, there's an arbitration clause in there. And if they had asserted arbitration against this, I think we probably would have arbitrated this at this meeting. But they also. Or you could have done it too. I'm sorry? Or you could have done it too. Or we could have done it too. But typically, I think the United States prefers to litigate in a court of federal claims rather than under their alternative arrangements. So, I mean, I assume you'll ask them why they didn't assert the arbitration clause, but. Oh, why didn't you assert the arbitration clause? I think because we thought that most disputes seeking money from the United States government go to the court of federal claims. It's sort of an ordinary place to go. And if the government wants to, would prefer to have it litigated in arbitration, that would have been fine. But they should have done that, obviously, more than a decade ago. Seems to me they're quite clearly perfectly happy to litigate it under these circumstances. At the end of the day, what I would ask the court to do is to recognize that Judge Smith analyzed the tariff, recognized all of the obligations of the party, evaluated against the course and conduct and industry, trade, understanding, came to the conclusion that these are straightforward, almost garden variety responsibilities of if you get more money than you're entitled to under an agreement, you have to pay the money back. But the questions are legal questions. It doesn't make any difference whether Judge Smith was the decider or Judge Brayden was the decider, because they're legal questions for us to decide to know. At the end of the day, there's a legal issue in there, but there's also, I don't think that, I mean, I would argue, obviously, that you can read these contracts to unambiguously impose that obligation on them. But the best you could say is that the contracts maybe are a slight bit ambiguous on that score. And under those circumstances, you would turn to what the experts say and what people in the business say. I don't see that the experts said anything meaningful about how the Memphis clauses would operate in these circumstances. They just testified that Memphis clauses meant that you could go to the Federal Power Commission. Well, they did take the position that somebody in the situation of the instrumentalities here would have understood, as everybody else understood, that you're setting a single rate under the tariff, but that rate is subject to review ultimately by the FERC. And if it turns out that the FERC changes that rate, then obviously you're going to have to go with a different rate. Yeah, but the only thing the experts can testify to is industry practice, not how they individually would have construed the contract, right? Right, although some of them were ISO and PX officials. Right, but what was the testimony about industry practice that said that these Memphis clauses created an obligation to do anything other than allow resort to the Federal Power Commission? Well, the clauses themselves only provide a mechanism by which you're not simply bound by whatever the, quote, market price that gets set in the first instance. They provide a mechanism for second-guessing that. It's the other provisions that impose the obligation to immediately pay if it turns out for any reason. So you're not relying on the Memphis clauses? I rely on them because they provide the context in which you have a FERC determination that is the basis upon which then the subsequent responsibility to pay. But you're not saying that the Memphis clauses impose the obligation? No, they don't. There's a separate, very explicit obligation imposed on them to pay any amounts they receive that are in excess of the amounts they're entitled to. And FERC has told us exactly the amounts they're entitled to. And that's what the court ought to have enforced. That's what Judge Smith did. That's what Judge Smith said with respect to the declaratory orders. I would ask the court to reinstate all of Judge Smith's decision in this case. If there are no questions, I'll reserve the balance of my time. OK, let's hear from the government. And then we'll save your rebuttal time, Mr. Phillips. This was received. Thank you. What's the government's position on the arbitration question? We didn't seek arbitration because we don't think that these contracts are enforceable by these particular plaintiffs. They're incorrect when they assert we prefer. No, but I mean, there's a dispute here. Why wouldn't it be covered by the arbitration clause? We don't think that they could bring an arbitration or bring a case in this court, because there's no privity between us and them. Your contention is that you're not bound by the arbitration clause? We would, but the person to arbitrate with would be either all of the buyers or the ISOPX. That's who we had the contract with. Well, so why isn't that a concession, that if there is a dispute here, it ought to go to arbitration? Because we think that if there's a dispute here, we're entitled to resolve that dispute with the ISO and the PX. Those are the people under the contract who we were supposed to deal with, and so we're entitled to deal with them. Now, they've never been a party to this suit, so that's the fundamental problem that we have. But you don't dispute that this would arbitration be permissible under the statute, under the dispute resolution statute? Yes, although, I mean, we would have a dispute who brings the arbitration. Yes, any dispute can be subject to arbitration. But if I can get back for a moment, the fundamental flaw in the argument of plaintiffs is that FERC never reset or changed the prices. Here, the tariff provisions that they rely on, the Memphis clauses, merely reserve the party's pre-existing rights. Well, they're not relying on the Memphis clause now. They found another provision of the contract that they like better. Right, and that provision, intelligently, they leave out the part that says any overcharges are due to the PX, not to the individual market participants. But there was no overcharge here. As they said, to have an overcharge, you have to get more than you're entitled to. Yeah, you make that windfall argument. And in response, at 52 and 53, you say that during the energy crisis, the WAPA, quote, incurred great cost purchasing energy at inflated prices outside the California organized market and provided that energy without receiving compensation. I couldn't find the evidence in the record to support those statements. Your Honor, that's part of the FERC proceedings, that we were also buyers of electricity, WAPA and BPA. And we still haven't been paid yet on those transactions that we bought electricity on. But getting back to my point is that they claimed that there was an overcharge. But to have an overcharge, you have to have received more than you're entitled to. The agencies received the market clearing price, which is the price they were entitled to at the time. But that doesn't seem to be directed to the question of privity, which we've been asking about. No, no. If Your Honor is asking about privity with regard to the PX, we never entered into any contract directly with the plaintiffs. We entered into contracts with the PX, which then entered into separate contracts with the buyers. And indeed, the IOU buyers are collaterally stopped from disputing that there's privity, because they successfully took the position that there was no privity in the Southern California Edison and Lynch cases. Nor was the PX acting as an agent for the buyers under Johnson Controls, because our obligations didn't run directly to the buyers. The overcharge provision that they cite clearly indicates that any payments of overcharges are due to the PX, not due to any particular buyers. Therefore, they're not agent, and there was no third-party beneficiary. In terms of the merits, if Professor Your Honor has a question, the point is that there were no overcharges. The FERC has never reset or changed the rates, so we remain entitled to the charges that we originally had under the market clearing prices. And the city of Reading clearly indicates that FERC didn't change the rates. It says, quote, we do not agree with FERC's assertion that it has broad authority under Section 206 of the Federal Power Act to retroactively reset rates that were charged in the California electricity markets during the time in question, October 2, 2000 through June 20, 2001, end quote. So FERC never actually changed the rates. And indeed, before the Ninth Circuit, the plaintiffs acknowledged that that was fatal to their claim. As the city of Reading case says, the plaintiffs, quote, conceded that FERC's resetting of the rates charged by the non-jurisdictional entities is the predicate for these pending contract actions, end quote. That's on page 835 of city of Reading. Then city of Reading went on to hold that FERC could not change the actual rates. And all that FERC did was to calculate a hypothetical would-have-been rate to use for purposes of calculating the jurisdictional entities. That's not the agency's refund obligations. That's under Federal Power Act Section 206b. But as city of Reading clearly said, that does not reset or change the prices. FERC's ability to change or set prices is contained in Federal Power Act Section 206a. And that only allows FERC to change prices prospectively, which it did here when it changed the prices effective June 20, 2001. As city of Reading held, though, it could not and did not change the prices for the period in question here. Because it didn't change the prices, there were no overcharges. The agencies remain entitled to the price they originally charged. Well, I understand that, Arnie. But what is the government's position if, suppose Mr. Phillips Klein's today initiated an arbitration? Would that be a timely invocation of arbitration? I'm not sure, Your Honor, at this point. Is there any authority as to whether the 2401, the statute of limitations, applies to arbitration? I don't know the answer to that, Your Honor. I'm sorry. But in any event, I still think that they would have a standing problem if they brought arbitration. And again, because they're not- Well, why wouldn't that be for the arbitrators to resolve? Right, but that's something we would assert if they did bring an arbitration. And then under the law of the case doctrine issue, under this court's Exxon case, the trial court has the discretion to reconsider its own decisions without being constrained by the law of the case doctrine, so long as that hasn't been affirmed on appeal, which wasn't the case here. And so if Your Honors have no further questions, we expect to request that this court affirm the decision of the Court of Federal Claims for the reasons I've stated and on our papers. Any more questions? Any more questions? OK. Thank you, counsel. Your Honors, I will attempt to be brief. I think the answer to your question, Judge Dyke, with respect to the alternative dispute resolution mechanism is that if you look at SA-141, it says that disputes arising out of just unreasonable rates are not subject to the ADR. Well, I've read that. But that sounds as though that clause is saying that the arbitrators won't determine the Federal whether the rates are just and reasonable, which is, under your theory, not what the arbitrators would be asked to decide here. I agree with that, although the language is a little squishier, at least in my judgment. And typically, normally when you're interpreting this kind of language to favor arbitration, you usually read it pretty broadly. I don't know whether you would narrowly read this kind of language in this context or not. But at least by way of an explanation, this clearly involves issues arising out of the just and reasonable rates, and therefore, it seems to me perfectly sensible to take it to the Court of Federal Claims. If the government had wanted to arbitrate it, I don't know that we would necessarily have fought that kind of an assertion. But at least I think at the time, we had a good faith basis for presenting it the way we did. I think it would be helpful if you mentioned cases earlier where you said that an arbitration clause won't be given effect unless one of the parties seeks arbitration. Sure. I think a supplemental letter giving those citations would be useful, and then the government could also address that question. Happy to do that. With respect to the question of whether or not there have been overcharges in this particular case, the government says there have been no overcharges because we paid the amount that we were required to pay. But the entire agreement is predicated on the assumption that that first payment may or may not be the amount that ultimately is required by the contract. And if it turns out, for whatever reason, then that's the language. If for any reason it turns out, then they have to pay that money back. And the idea as to whom you pay it shouldn't make any difference at this point. Judge Smith is very explicit about that in analyzing. He said that's a question to deal with the remedy. That's not a question that absolves the government of its duty to pay money. At this point, they haven't paid a nickel toward the overcharges that they were able to collect. That's money that should be paid. What's your view as to whether it's too late to initiate arbitration? I'm sorry, Your Honor? What is your view as to whether it is too late to initiate arbitration, and in particular, whether the six-year statute limitations would apply? I would think that the filing of this lawsuit would undeniably toll the time for that if it were necessary. I thought you got no equitable tolling under 2401. Well, I mean, it seems to me, if it's not a tolling argument, clearly, we filed this lawsuit. It would seem to me then the court ought to retain jurisdiction, require it to be submitted to arbitration under those circumstances, retain jurisdiction in order to enforce the arbitration agreement, if need be, at the end of the day. But it seems to me, as I said, we'll provide you with that case law. But the cases are pretty clear that if neither party seeks arbitration, then the arbitration right essentially falls out of the case. Again, I would ask the court to reinstate Judge Smith's orders. While you're there, let's set a time limit for the additional information Judge Dyke has requested. What makes sense? Seven days, 10 days? It's not good. We can get it for you by the end of the day, if you'd like, frankly. But three days is fine. Why don't we do Tuesday, close the business on Tuesday? I will translate that to you. All right. And then a few days thereafter, if the government wishes to respond. Thank you. OK. Thank you. Thank you both. The case is taken under submission.